PILGERAM, Appellant, v. HASS et al., Respondents.

No. 8587

Submitted December 13, 1945. Decided March 27, 1946.

167 Pac. (2d) 339

Mr. E. J. Stromnes, of Great Falls, and Mr. Lester H. Loble, both of Helena, for appellant.

Mr. Robert E. Purcell, of Jordan, and Messrs. Jardine, Chase & Stephenson, of Great Falls, for respondents.

JEREMIAH J. Lynch, District Judge (sitting in place of ANGSTMAN, J., disqualified) delivered the opinion of the court.

This is an appeal by the plaintiff from a judgment in favor of the defendants in an action wherein he sought damages of them for personal injuries.

In plaintiff's amended complaint it is alleged that the defendant, Frank J. Haas, was on the 25th day of May, 1942, engaged in the contracting and construction business in the state of Montana; that on said day U. S. Highway No. 18 was a public highway and thoroughfare within the state of Montana; that on said day between the hours of 5 and 6 o'clock p. m. the plaintiff was driving a Ford automobile in an easterly direction on said highway in the county of Garfield; that he was driving the same in a careful manner and at a rate of speed of approximately 40 miles per hour; that on said day the defendant, Frank J. Haas, was the owner of a Kenworth truck, a trailer and a caterpillar elevating grader which were used by him in his said business; that on said day the defendant, Austin Tayer, was in the employ of the. defandant, Frank J. Haas, and that acting within the scope of his employment he was between the hours of 5 and 6 o'clock p. m. engaged in driving the truck in a westerly direction on said highway in the county of Garfield; that the trailer was attached to the truck at the time, had a width of approximately 7 feet, 11 inches and had loaded upon it the grader; that between the hours of 5 and 6 o'clock p. m. the automobile and truck passed each other in the county of Garfield at a point approximately 35 miles east of the town of Winnett, Montana, where the highway was about 18 feet wide that the part of the grader known as the disk then extended 15 inches over the left-hand side of the trailer; that when the motor vehicles were in the act of passing each other the disk severed the left arm of plaintiff about two inches above the elbow, the arm being at the time resting on the sill of the left door of his car; that the injury was caused by the negligence of the defendant, Austin Tayer, and consisted of the following acts or omissions; (a) His failure to drive the truck and trailer in a careful manner considering the width of the road, the width of the trailer and the protrusion beyond the side of the trailer; (b) his failure to load the grader in such a manner that the disk would not constitute a hazard to on-coming

traffic; (c) his failure to fasten the grader on the trailer so that the same would not move and allow the disk to project beyond the edge of the trailer; (d) his failure to place a warning device on that part of the grader extending over the edge of the trailer; (e) his failure to examine the load from time to time to make sure that the disk did not extend so far over the edge of the trailer as to constitute a hazard to passing traffic; (f) his failure to operate the truck and trailer on the right side of the highway; (g) his causing and permitting the disk to protrude beyond the center of the highway and into that part thereof reserved to plaintiff; (h) his failure to use a pilot car to precede him on the highway for the purpose of warning on-coming traffic of the hazard created by the moving truck. In the amended complaint it is further alleged that the plaintiff has been permanently injured and has suffered and will continue to suffer great pain in his crippled left arm. Damages in the sum of $40,000 for permanent injuries and in the sum of $7,500 for impairment of earning capacity are prayed for against the defendants.

The allegation of negligence on the part of the defendant, Austin Tayer, and the allegations that the grader was on the trailer at the time plaintiff was injured, that the disk extended over the left-hand side of the trailer 15 inches or at all, that the disk severed plaintiff's left arm, that the automobile was driven by plaintiff in a careful manner and at a speed approximating 40 miles per hour, and that plaintiff was permanently injured and has suffered and will continue to suffer great pain are denied in the answer; all the other allegations contained in the amended complaint are admitted. By way of affirmative defense it is charged in the answer that plaintiff in driving the Ford automobile at and immediately before the time of his injury was guilty of contributory negligence which proximately caused the same, as follows: (a) That he failed to keep a proper or any lookout ahead; (b) that he failed to turn the car sufficiently to the right so as to pass the truck and trailer without injury; (c) that he drove with his left arm protruding

out of the front window of the car when passing the truck and trailer; (d) that he failed when passing the truck and trailer to remove his left arm from its position out of said window; (e) that in approaching and passing the truck and trailer he operated the car to the left of the center of the highway; (f) that in approaching and passing the truck and trailer he operated the car with his left arm protruding beyond the center line of the highway. In his reply the plaintiff denied the allegations contained in said affirmative defense.

The case came on for trial before the court, sitting with a jury, on the 12th day of June, 1944, the plaintiff being present and represented by counsel, Messrs. E. J. Stromnes and Albert H. Angstman, and the defendants being present and represented by counsel, Messrs. Art Jardine, John D. Stephenson and Robert E. Purcell.

The plaintiff, called as a witness in his own behalf, testified that on the 25th day of May, 1942, and for many months prior thereto he was employed as a field man by the State Land Department that in the afternoon of said day, his duties requiring his presence in Jordon, Montana, he was driving a Ford automobile in an easterly direction toward the town on U. S. Highway No. 18; that on the way he stopped at Winnett and bought a bottle of wine which he never opened; that between the hours of 5 and 6 o'clock at a point about 35 miles east of Winnett he saw the truck being driven by the defendant, Austin Tayer, coming west on said highway; that the grader with a disk fastened to it was upon the trailer; that the truck was over the center of the highway and the disk stuck out some distance beyond the center of the highway but it was not visible to him at the time because of a bend in the road; that the truck was traveling at a speed of 30 or 35 miles an hour and taking up at least 11 feet of the highway; that he was driving the automobile at the rate of 35 or 40 miles per hour and was well over on his side of the highway; that he had both hands on the wheel but his left elbow protruded out of the window of the automobile two or three

inches; that the running board of the automobile was about eight inches wide; that when the automobile and trailer were passing each other the disk came in contact with the left-hand door about an inch above the handle and at the same time cut off his left arm above the elbow; that then his car proceeded 50 or 75 feet before he brought it to a stop; that in his estimation the highway at the point where the collision occurred was about 18 feet wide, and that the trailer carried no warning flags. The plaintiff further testified that the defendant Austin Tayer, likewise halted his truck, came over to him and noticing that his left arm, was bleeding badly he applied a tourniquet and rushed him westward in his car to a hospital in Lewistown, Montana, where he received medical and surgical treatment. He also testified that in passing the halted truck he saw the disk for the first time and it was sticking out beyond the trailer. He also testified that his injured left arm always pained him more or less; that for nearly a year before his injury he earned $175 a month, and that his injury greatly impaired if it did not entirely destroy his ability to make a living. On cross-examination the plaintiff testified that his car was about eight feet in width and that the disk stuck out about 14 inches from the edge of the trailer. He admitted that when his deposition was taken on the 24th day of August, 1942, he stated that at the time the truck and automobile passed each other on the highway the truck was on the right side of the road going west and the automobile was on the right side of the road going east.

Frank J. Haas, one of the defendants, called as a witness for the plaintiff, testified that on or about the 25th day of May, 1942, he was engaged in building an emergency airport for the government at Cut Bank, Montana; that on that day he owned the Kenworth truck, trailer and grader in question and directed the defendant, Austin Tayer, to load the grader on the trailer and move the same from Wibaux County, Montana, to Cut Bank; that the grader was used to dig out dirt and load it into a truck if removal became necessary; that the

grader weighed around 11,500 pounds; that the disk which was fastened to it operated much like a disk plow on a farm; that the disk was made of steel and had a diameter of 30 inches, and that the length of the trailer was about 24 feet.

Austin Tayer, the other defendant, called as a witness for the plaintiff, testified that he had been employed by his co-defendant since 1939; that on the 24th day of May, 1942, he was instructed to load the grader on the trailer at a point about ten miles north of Baker, Montana, and transport it to Cut Bank; that in the morning of the 25th day of May, 1942, he started with the truck and trailer for Cut Bank; that the load on the trailer had an approximate width of 11 feet, 4 inches; that the truck and plaintiff's automobile passed each other on U. S. Highway No. 18 at a point about 40 miles west of Jordan, Montana; that the speed of the truck at the time was around 25 miles an hour, but before that it was 30 or 35 miles an hour, and that the road was gravelled and rough in places and he kept on his own side of it most of the time when he could.

H. C. Biering, Irving R. Judd and Mrs. Nettie Pilgeram, plaintiff's wife, also testified in behalf of the plaintiff; Mr. Biering to the effect that the plaintiff had worked under him in the State Land Department, was an industrious and conscientious employee and was healthy, vigorous and active; Mr. Judd as to the expectancy of life of the plaintiff to cognate matters, and Mrs. Pilgeram as to his condtion of health before and after his injury. The plaintiff then rested his case in chief.

Austin Tayer, called as a witness in his own behalf and that of his codefendant, testified that he was employed by Mr. Haas to drive trucks and caterpillar graders to move equipment from one job to another; that on the 24th day of May, 1942, he supervised the loading of the grader on the trailer and then fastened it by using chains and boomers; that on the next day he set out for Cut Bank with the truck and trailer; that before doing so he fastened a red flag on the left side

off the front bumper of the truck, another above the disk, another on the right rear wheel of the grader, and that all of them were still in place when he reached Cut Bank; that from time to time on the way he stopped to tighten the chains which held the grader in position, but it was not necessary to tighten them at all after he passed through Miles City; that the overall length of the truck and trailer was around 45 feet; that he first saw the plaintiff's automobile on U. S. Highway No. 18 when it was approximately half a mile away and that it continued in plain view until the truck and automobile met; that he was then driving and thereafter continued to drive on the right side of the road; that the plaintiff was driving his car in the center of the road and that when the motor vehicles were about 100 hundred yards from each other he noticed the plaintiff's arm was sticking out of the left window of his car; that when the car was just in front of the truck he started cutting into the ditch on his righthand side; that before doing so the truck was well over on the righthand side of the highway; that he drove the truck into the ditch and came out on the highway with it some distance further west; that it was then about six o'clock in the afternoon; that the highway at the point where the automobile and truck passed each other was in his estimation 24 feet wide; that when he got the truck back on the highway he brought it to a stop for the purpose of observing whether or not the load had become loosened; that upon stepping out of the truck he saw that plaintiff's car had come to a stop two or three hundred feet further east; that when the truck and car passed each other he felt no jar; that as he was unable to see the plaintiff anywhere he started toward the car; that on the way he saw the arm lying on the road about midway between the center and the shoulder thereof facing west; that this was the first indication he had that plaintiff had been injured; that he then hastened to the car which stood with the two left wheels on the shoulder of the road facing west, and on reaching it he found the plaintiff slumped behind the wheel

with part of his arm gone; that he moved the plaintiff from the left-hand to the right-hand side of the seat, turned the car around, removed plaintiff's coat, wrapped his own belt tightly around the injured arm to stop the bleeding and headed for Winnett; that at a point about three miles east of the town of Mosby he stopped the car and requested a young man whom he saw there to come in and assist; that he came and sat on the back seat and held the tourniquet until they arrived in Winnett; that in Winnett there was no medical or surgical aid available and so he continued west to Lewistown after he took another young man into the car to assist in holding the tourniquet, and upon arriving there he took the plaintiff to St. Joseph's hospital for medical and surgical treatment.

C. J. Bresee, a witness for the defendants, testified that he was a physician and surgeon and had practiced his profession for more than thirty years; that on the 8th and 9th of June, 1944, he made a physical examination of the plaintiff; that he saw that slightly more than one-half of the long bone in the left arm from the elbow to the shoulder remained; that because the arm was severed below the middle line between the elbow and the shoulder all the muscles that control the movement of that bone in the shoulder joint were practically spared; that an artificial arm may help him to do certain kinds of work and that in his opinion the pain in the injured arm would cease in time.

Carl Thomas, a witness for the defendants, testified that on the 25th day of May, 1942, he and two other young men were together at a point a short distance east of Mosby; that the plaintiff drove up in his car and noticing that the three of them were mounted on one horse he stopped and remarked that three men on one horse were too many and invited one of them to ride with him; that each declined at first but he insisted and two of them then got into the car with him and rode approximately half a mile (the plaintiff on cross-examination denied that out of Mosby he stopped his car, picked up

two men and rode them a short distance); that shortly after the same car returned and stopped and a fourth young man who had joined the party stepped into it apparently on request and it proceeded westward.

Henry Langman, a witness for the defendants, testified that on the 25th day of May, 1942, and prior thereto he was a section man employed by the State Highway Commission; that he saw the plaintiff in Winnett that day about six o'clock; that he was in a car with two other men and had been injured; that the sheriff of Petroleum county to whom they reported advised them to continue to Lewistown and promised to remove the truck from the highway; that the sheriff and he arrived at the scene of the accident which was about 40 miles west of Jordan close to 7 o'clock; that they saw a big truck parked on the right-hand side of the highway facing west; that they traced the tracks of the truck backward to the ditch and eastward along the ditch a distance of 140 or 150 feet to the point where it apparently left the road; that he saw an arm lying on the road close to where the truck appeared to have left it; that it lay about two-thirds of the way over on the right-hand side of the road facing west; that he did not remove the arm but a highway patrolman who came from Lewistown did so later; that at the request of the patrolman he drove the truck westward about two miles and parked it off the highway; that the right-hand tires of the truck made a track on the shoulder of the highway eastward from the point where it apparently turned toward the ditch a distance of about 500 feet; that he saw tracks of a car on the left-hand side of the road facing east and also saw tracks made when it was backed across to the shoulder of the road and turned to the west; that in the vicinity the road was straight over a stretch of several hundreds yards and according to measurements which he made in the morning of June 13, 1944, had a width varying from 25½ feet to 22 feet, 2 inches at the point where the truck went into the ditch.

Harold Neiter, a witness for the defendants, testified that he was a highway section man and had been such since before the 25th day of May, 1942, that in the morning of the 26th day of May, 1942, at a point about 41 miles west of Jordan and about 37 miles east of Winnett he noticed a truck had gotten off the highway and a car or two had turned around; that he saw a truck alongside the road between two and two and a half miles away; that the highway had been graded, had some gravel on it and was dry; that in the morning of June 13, 1944, he and Henry Langman measured the highway at certain points and found that it had a width of 22 feet, 2 inches at the place where the truck went into the ditch and width of from 24 to 25½ feet on either side of that place.

Doyle Kester, a witness for the defendants, testified that in the month of May, 1942, he was a deputy sheriff of Garfield county; that in the morning of May 26, 1942, the highway patrolman at Lewistown informed him by telephone in Jordan of an accident on the highway in the western part of the county; that he then drove west on U. S. Highway No. 18 for the purpose of making an investigation; that at a point about eight miles west of Sand Springs he saw the tracks of the right-hand tires of a truck close to the shoulder of the highway; that about 300 yards further on the tracks eased onto the shoulder and so continued until they made a sharp turn into the ditch; that the tracks showed in the ditch and out upon the highway further west; that he noticed the tracks of a car at an angle across the highway on the left of the center and on the shoulder near where the truck pulled into the ditch; that the tracks ended there and that other tracks leading from the shoulder indicated the car had been turned around; that he saw a bloody shirt sleeve in the ditch and took possession of it; that his measurements of the highway at and near the scene of the accident showed a width of from 23 to 25 feet; that he then proceeded west about two miles to where the truck was parked; that he saw a flag near the

disk, another near the rear of the truck on the left-hand side and another toward the front of the truck; that he noticed blood and skin and hair on the disk, and that according to his measurement it was nine feet across from the right-hand side of the trailer to the extreme left of the load.

Arza R. Barger, a witness for the defendants, testified that he was a photographer by occupation and lived in Lewistown; that on the 26th day of May, 1942, he took a picture of plaintiff's automobile in front of the Messier garage in Lewistown; that at the time he saw a pasteboard box containing what looked to be a lunch of some kind and a quart bottle of wine on the back seat of the automobile; that it was unwrapped and that two and a half or three inches of the liquor remained.

Ike Messier, a witness for the defendants, testified that he was an automobile mechanic engaged in running a garage; that on or about the 25th day of May, 1942, plaintiff's automobile was brought to his garage in Lewistown; that he examined the inside of the automobile and saw a quart bottle of wine about ten inches long and what looked like a part of a lunch on the back seat, and that two and a half or three inches of the wine remained.

Frank J. Haas, called as a witness in his own behalf and that of his codefendant, testified that the bottom of the disk while loaded stood four feet eight inches above the ground according to a measurement which he made at Cut Bank. It was then stipulated in open court that the bottom of the window of the car on which plaintiff's arm rested was four feet from the ground when the car was not in motion. Thereupon the defendants rested.

Mrs. Nettie Pilgeram, called as a witness in rebuttal testified that on the 26th day of May, 1942, she found her husband's car in the Messier garage and examined it; that the lunch which she had put up for him on the 25th and a bottle wrapped in paper were in the car; that upon removing the paper she discovered it was a full quart of wine or a "fifth"

in the language of drinking people; that she did not see a partially consumed bottle of wine in the car.

On the 13th day of June, 1944, the evidence in the case was closed and the instructions to the jury were settled. On the 14th day of June, 1944, the court read its instructions to the jury and counsel for the parties made their arguments, after which the jury retired in charge of a sworn bailiff to deliberate. On the 15th day of June, 1944, at the hour of 3:23 p. m., the jury returned into open court with their verdict finding for the defendants and against the plaintiff. A poll of the jury being required by counsel for the plaintiff, eight of them answered that it was their verdict and four of them answered that it was not their verdict. On the 16th day of June, 1944, the clerk of the court entered a judgment in conformity to the verdict. On the 21st day of June, 1944, the plaintiff filed a notice of motion to vacate the verdict of the jury and grant him a new trial. On the 5th day of September, 1944, the motion was heard, submitted and taken under advisement. On the 18th day of September, 1944, the court made and filed its order denying the motion.

The brief of appellant contains nine specifications of error, one of which is to the effect that the court erred in denying plaintiff's motion for a new trial and another of which is to the effect that the court erred in entering judgment in favor of defendants.

Error is predicated on the fact that the court required its stenographer to read to the jury after the case had been submitted to them the testimony of the witnesses Austin Tayer, William P. Pilgeram, Henry Langman and Doyle Kester. The defendants in their brief attempt to justify the procedure followed upon the authority of Freezer v. Sweeney, 8 Mont. 508, 21 Pac. 20. The opinion in that case was handed down long before what is now section 9354 of the Revised Codes was amended by the addition of the sentence: "Such information must be given in writing or taken down by the stenographer." For aught appears in the Freezer case the jury

may have represented to the court that they were in disagreement as to the testimony of the witnesses Purcell and Decker. From first to last in the case at bar not one juror stated to the court that there was disagreement between them as to the testimony of any or all of the four witnesses named. Obviously the jury or some of them desired to have their memories refreshed by the reading of the testimony.

In the construction of an amendatory Act it will be presumed that the legislature, in passing it, intended to make some change in the existing law, and therefore the court should endeavor to give some effect to the amendment. Nichols v. School District, 87 Mont. 181, 287 Pac. 624; 59 C. J. 1097. Our view of the proper procedure under section 9354 as it stands now and has stood since 1895 is this: After the jury have retired for deliberation, if there be a disagreement between them as to any part of the testimony which has been given at the trial they may require the bailiff in charge to conduct them into court. Upon being brought into court the presiding judge should find out from them what the particular testimony is that they are not in accord on. If the judge has a clear recollection of the testimony in dispute he may then give it to them orally from the bench, the stenographer at the same time taking down what is said in shorthand. If he does not desire or is not in a position to follow that course he should require the stenographer to furnish him with a transcript of the testimony in dispute duly certified as correct. This he must read to the jury. Any interrogation of the jury and any information imparted to them must take place in the presence of, or after notice to, the parties or counsel. All or a part of the testimony of any witness should not be read merely because one or more of the jury desire to have their memories refreshed. Hersey v. Tully, 8 Colo. App. 110, 44 Pac. 854; Fairbanks, Morse & Co. v. Weeber, 15 Colo. App. 268, 62 Pac. 368; Jenkins v. Stephens, 64 Utah 307, 231 Pac. 112.

According to the record the jury were returned into open

court on the 14th day of June at the hour of 6:25 p. m. There were present the officers of the court; E. J. Stromnes representing the plaintiff, his co-counsel, Albert H. Angstman, having left for home about 1 o'clock p. m., and Art Jardine, John D. Stephenson and Robert E. Purcell representing the defendants. Addressing the jury the court said: "What do you want, gentlemen?" to which a juror replied, "We would like to hear the testimony of Mr. Haas and Mr. Tayer and also the questions Mr. Jardine asked Mr. Pilgeram on some hearing, I don't know whether it was Lewistown or what." The court then inquired, "Specifically about what?" Mr. Jardine then stated, "I think what he means by Mr. Pilgeram's testimony was when I was trying to impeach on the question of where the car was in the road at the time of the accident, I mean in relation to the hill, and I think the testimony of Mr. Tayer on the first day,—I suppose they want all of that." In response to that the juror said, "Not necessarily —on the first day." Mr. Stromnes interposed and said, "That was the day that Mr. Haas was called as a witness for the plaintiff and." The court then addressed counsel and said, "Just a minute Mr. Stromnes." The juror then continued, "And Mr. Tayer's the first day." Thereupon, the court directed the court reporter to get the testimony of Mr. Tayer and read it to the jury. After a short pause in the proceedings the reporter read from his note the testimony which Tayer gave on the first day of the trial. The court then recessed. On the same day at the hour of 8:15 p. m. the jury were again returned into open court. The court then inquired, "Now gentlemen of the jury, do you still desire information?" A juror replied, "Yes sir." The court said, "On what particular point?" The juror answered, "Well I think they want to hear all of Mr. Pilgeram's testimony." The court repeated, "All of it?" The juror replied, "That is what they decided when they left." The court then directed the reporter to read to the jury the testimony of Mr. Pilgeram. On the 15th day of June at the hour of 11:50 a. m. the jury were again

returned into open court and on being asked by the court whether or not they had agreed on a verdict, several of them replied that they had not and that there was no reasonable probability that they could. A juror then expressed a desire to hear read the testimony of Doyle Kester and Henry Langman. The court remarked, ''Well, if you gentlemen and ladies want to hear that testimony and think it would help out, we will have it read.'' Thereafter, at the hour of 1:07 p. m. the reporter read to the jury from his notes the testimony of Doyle Kester and Henry Langman, following which the jury retired to their room to deliberate further.

In his affidavit in support of plaintiff's motion for a new trial E. J. Stromnes averred that because the court spoke the words, ''Just a moment Mr. Stromnes'' in a brusque and stern manner he was precluded from making the objection which he intended to make, namely, that no testimony whatsoever should be read to the jury unless the same was first reduced to writing, and further unless it was shown that there was disagreement between the jury as to some particular testimony. He averred further that at the evening session of the court on the 14th day of June he arose to make the objection which he intended making earlier in the day but was prevented from doing so by the command of the court, ''Sit down Mr. Stromnes, you are drunk.'' The record discloses, however, that Mr. Stromnes then objected to the order and comment of the court, and later excepted to the statement of the court in the presence of the jury that he was intoxicated and might subject himself to removal from the courtroom. There is nothing in the proceedings of the afternoon session of the court on the 14th day of June which would justify the inference that Mr. Stromnes was either intimidated or prevented from making any objection that appealed to him at the time. At the forenoon and the first afternoon sessions of the court on the 15th day of June Mr. Stromnes, though present, remained silent.

On the record as a whole, we hold that plaintiff by his

silence when he should have spoken waived any irregularity on the part of the court in ordering read the testimony of the witnesses Tayer, Pilgeram, Kester and Langman. 67 C. J. 307; First Nat. Bank of Post v. Republic Supply Co., Tex. Civ. App., 166 S. W. (2d) 373; 2 Hyatt on Trials, sec. 1947, page 1906; 64 C. J. 1288 et seq.

Error is assigned because the court reprimanded E. J. Stromnes, of counsel for plaintiff, in the presence of the jury at the night session of the court on the 14th day of June. The great preponderance of the evidence as disclosed by the record supports the view that he was under the influence of liquor at the time and conducted himself in an unseemly manner. The court in the presence of the jury directed the reporter to have "his record show that Mr. Stromnes appears to be in an intoxicated condition and he is making himself obnoxious to the court and jury and interfering with the court reporter in the reading of his notes." Some time later and while the jury were still present Mr. Stromnes excepted to what he termed the comment of the court. Addressing the reporter the court then added: "Let your record show that the plaintiff's counsel appears to be under the influence of liquor and has continually bothered the court reporter in the reading of the testimony, and the court felt justified in admonishing counsel if he did not sit down and desist he would be removed from the courtroom." Just before Mr. Stromnes took his exception the court admonished the jury not to let any matter not connected with the testimony to enter into their consideration of the case, and to entirely disregard all comment of the court and counsel. It is also reasonably certain that the court two or three times ordered Mr. Stromnes to sit down and upon his failing to do so directed the sheriff to remove him from the courtroom, that the sheriff left his seat to carry out the order and that then he, Mr. Stromnes, resumed his seat. Up to this point and indeed until the last ballot was taken shortly before the hour of 3:23 p. m. on June 15 the jury stood five in favor of the plaintiff to seven in favor of the defendants. We believe

the effect of the scene just described and particularly of the remark of the court that Mr. Stromnes was making himself obnoxious to the court and jury was to make a verdict in favor of the plaintiff virtually impossible. The harm was done and the admonition of the court could not undo it. In such an atmosphere the plaintiff, seeking justice, was placed at a serious disadvantage. It would be better practice to temporarily excuse the jury and deal appropriately with Mr. Stromnes in their absence. 24 Standard Proc. 1087; 64 C. J. 92.

It is contended that the court erred in admitting in evidence a photograph, defendants' exhibit 1, over plaintiff's objection that no proper foundation was laid for it. The witness Langman testified that he reached the scene of the collision about 7 o'clock in the evening of the 25th day of May, 1942 that he closely examined the highway for tracks of the truck and car in question and made measurements of the width of the highway at and in the vicinity of the scene of the collision. He further testified that although he did not take the photograph it was nevertheless a correct representation of the surface of the highway at and near the place of the collision in the evening of the 25th day of May, 1942. Where the nature or condition of a place becomes a matter of controversy in a civil action, photographs of the place shown to be true representations of it at the time in question are generally admissible in evidence. Photographs may be proved to be correct representations by witnesses other than the person who took them. Toole v. Paumie Parisian Dye House, 98 Mont. 191, 39 Pac. (2d) 965; 9 Ency. of Evidence 776; 20 Am. Jur., sec. 730, page 610. The words "looking west—truck tracks on north shoulder and in ditch" on the back of the photograph were not called to the attention of the court and no objection was made to them. Had plaintiff made proper and seasonable objection doubtless the court would have ordered them stricken as not a part of the photograph. Having failed so to do he cannot now complain. Edquist v. Tripp &

Dragstedt Co., 93 Mont. 446, 19 Pac. (2d) 637. The court ruled correctly in admitting the photograph in evidence.

Error is predicated upon the court's refusal to give plaintiff's offered instruction No. 8, which reads as follows: "You are instructed that under the laws of Montana, it is unlawful for any vehicle, such as that operated by defendants at the time plaintiff was injured, to exceed a total outside width, including any load thereon, of eight feet." Section 1751.2, Revised Codes of Montana 1935, as amended by section 1 of Chapter 184, Laws of 1939, limits the total outside width of any vehicle, including the load thereon, being driven over the public highways of the state of Montana to eight feet. But section 1751.6, as amended by Section 5 of the same Chapter, vests the state highway commission with power to issue a special permit in writing, upon proper application therefor, to the person applying authorizing him to operate a vehicle of a size exceeding the maximum specified in said section 1751.2, as amended. Section 1751.9, as amended by section 7 of the same Chapter, makes it a misdemeanor for any person to violate any of the provisions of the Act. In his direct examination as a witness for the plaintiff the defendant Tayer, after stating that the width of the load was about 11 feet, 4 inches, was asked whether or not he had obtained a permit to haul it. His answer was in the affirmative. There was no further testimony upon the point. His testimony regarding the permit is fortified by the presumption that the law has been obeyed. Sec. 10606, Rev. Codes of Montana, 1935, subd. 33; McMahon v. Cooney, 95 Mont. 138, 25 Pac. (2d) 131; Head v. Wilson, 36 Cal. App. (2d) 244, 97 Pac. (2d) 509. Furthermore, the negligence, if any, of the defendants in moving a load over eight feet in width over a public highway in the state of Montana is not an issue in the case. There is no allegation of negligence in that regard set forth in the amended complaint. Where the negligence relied on consists of an act or omission in violation of a duty imposed by statute, the complaint, in order to state a cause of

action, must allege facts showing such violation. 45 C. J.. 1092. The court properly refused to give the instruction.

It is contended that the court erred in striking from plaintiff's tendered instruction No. 9 the following: "And you are further instructed that the issuance of a special permit does not entitle one to operate a loaded motor vehicle upon the highways of this state in a negligent fashion, or with a loaded vehicle which constitutes an unusual traffic menace or hazard to any other person lawfully using the highway." As thus modified the instruction was given as the court's instruction No. 19. Instruction No. 19 is as follows: "You are instructed that under the laws of the state of Montana, traffic must everywhere and at all times keep to the right. Vehicles moving in opposite directions must pass each other by turning to the right. If you find from the evidence in this case that the defendant Tayer negligently loaded and operated his loaded vehicle or any part of it on the wrong, or the south half, of the highway at the point of the accident, and that such negligence proximately caused the plaintiff's injuries, and that the plaintiff was himself free from contributory negligence, then you are instructed to find for the plaintiff." The stricken matter contains an intimation that defendants' truck was operated on the highway in a negligent manner. Furthermore, there was no evidence given to justify the conclusion that the loaded truck constituted an unusual traffic menace or hazard to a person lawfully using the highway. Instruction No. 19 given by the court correctly stated the law so far as the negligence, if any, of the defendant Tayer was concerned. The court did right in striking the matter above quoted.

It is further contended that the court erred in giving defendants' offered instruction No. 11, as the court's instruction No. 11. It reads as follows: "You are instructed that under the facts in this case contributory negligence, if any, as herein defined on the part of plaintiff is a complete bar to any recovery by plaintiff. Contributory negligence, if any, of plaintiff, as used in these instructions is conduct

for which he is responsible amounting to breach of the duty which the law imposes upon persons to protect themselves from injuries and which concurring and cooperating with the acts of negligence for which defendant is responsible, contributes to the injury complained of as a proximate cause.'' The palintiff objected to the instruction on the grounds that ''it is an incorrect statement of the obligation imposed by law, which varies according to the circumstances, and also that it is confusing and ambiguous and that it does not define conduct at all for which a person is responsible and lets the jury engage in a wild guessing contest.'' This is the only instruction which assumed to define contributory negligence. It is so general and involved and so wanting in substance that it did not afford the jury any guide in determining whether or not the plaintiff was guilty of contributory negligence. It fails to point out the nature of the duty which the law imposes upon a person in order to protect himself from injury at the hands of another. It does not say that the duty consists of slight care, ordinary care or great care. The jury were forced to speculate as to the meaning of the language used in what under the circumstances was a highly important instruction. The second sentence of the instruction was evidently taken from 45 Corpus Juris at page 942. Many things are said in the opinions of the appellate courts which are sound law, but which would be improper in the form of instructions to a jury. 64 C. J. 633, 665. If this be true of the opinions of the highest courts, much more so is it true of statements found in text books or cyclopedias. This court in the case of Leary v. Anaconda Copper Min. Co., 36 Mont. 157, 92 Pac. 477, 478, defined contributory negligence in the following simple and easily understood language: ''Contributory negligence, in its legal signification, is such an act or omission on the part of a plaintiff amounting to a want of ordinary care as, concurring or co-operating with the negligent act of the defendant, is a proximate cause or occasion of the injury complained of.'' This definition or one substantially like it has been approved

by most of the highest courts of the country. Attorneys in formulating instructions should, so far as possible, employ terms and expressions which have been approved by this court as technically correct. Nagle v. City of Billings, 77 Mont. 205, 250 Pac. 445. In an action involving contributory negligence the court should soundly define it, and leave to the jury the application of the facts, as found by them, to the law as given by the court. Musser v. Los Angeles & S. L. R. Co., 53 Nev. 304, 299 Pac. 1020. The instruction in question does not correctly state the law and should have been refused.

It is also contended that the court erred in giving defendants' offered instruction No. 13 as the court's instruction No. 22. It reads as follows: "You are instructed that if after hearing all of the evidence you feel that it is a matter of guess or speculation as to wether the defendant Tayer was negligent as alleged in the amended complaint or as to whether negligence if shown was the proximate cause of injury to the plaintiff, then your verdict shall be for the defendant." The plaintiff objected to the instruction on the grounds that "it is repetitive and accentuates and exaggerates the offense of contributory negligence and the burden of proof, both of which heretofore in other instructions have been adequately defined. The objection did not point out the defect which inheres in the instruction. In his brief he urges new and different grounds of objection to the instruction, namely, that there was nothing in the record warranting the giving of it, that the jury did not have to indulge in guesswork or speculation, that their province was to determine on which side lay the truth, and that there was positive evidence justifying a verdict either way consistent with the facts. Since this objection was not made at the time of settling the instructions as required by section 9349, Revised Codes 1935, it was not available to plaintiff either on motion for a new trial or on appeal to this court, though otherwise justified. Brennan v. Mayo, 100 Mont. 439, 50 Pac. (2d) 245. The defendants in their brief attempt to justify the instruction on the authority

of Ramsey v. Burns, 27. Mont. 154, 69 Pac. 711, but the instruction quoted in that case is substantially different from the instruction under attack. Even the former has its defect for conjectures or specualtions whether supported or not supported by the evidence still remain conjectures or speculations and will not in or of themselves support a verdict. Prentice Packing & Storage Co. v. United Pac. Ins. Co., 5 Wash. (2d) 144, 106 Pac. (2d) 314; Oklahoma City v. Wilcoxson, 173 Okl. 433, 48 Pac. (2d) 1039; McDonald v. F. W. Woolworth Co., 66 R. I. 488, 20 A. (2d) 250; 1 Shearman & Redfield on the law of negligence, sec. 57, page 126. The instruction is unsound and should not have been given (Sandanger v. Carlisle Packing Co., 112 Wash. 480, 192 P. 1005), but as we have said the plaintiff has failed to place himself in a position to effectively attack it.

Finally, defendants urge in their brief that as, under the ▇▇ evidence, the jury reached the only possible verdict that could be reached it should not be disturbed by this court. The fact that the cold record may show that the evidence preponderated in favor of the defendants does not foreclose consideration on our part of any error or irregularity committed at the trial.

Because of the irregularity considered by the court in dealing with the second specification of error and the giving of instruction No. 11 the judgment is reversed and the cause is remanded to the district court with direction to grant the plaintiff a new trial.

Mr. Chief Justice Johnson, and Associate Justices Morris, Adair, and Cheadle, concur.